UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JESSICA MAIORANO, a minor, by and
through JAMES MAIORANO, as next
friend; JACLYN COSTELLO, by and
through next friend JOANNE COSTELLO

Plaintiffs,

-vs-                                                    Case No.  6:05-cv-107-Orl-19KRS

GILBERT SANTIAGO, an Orange County
Sheriff's Officer in his individual capacity;
JOHN DOES 1-5; KEVIN BEARY,
SHERIFF OF ORANGE COUNTY,
FLORIDA, Jointly, Severally, and/or in the
Alternative

Defendants.
_____

## ORDER

This case comes before the Court on the following:

1.     Defendant Gilberto Santiago's Motion for Summary Judgment and Memorandum of

Law in Support Thereof.  (Doc. No. 41, filed March 31, 2006);

2.     Defendant Kevin Beary's Motion for Summary Judgment and Memorandum of Law in

Support Thereof.  (Doc. No. 42, filed on March 31, 2006);

3.     Defendants Gilberto Santiago's and Kevin Beary's Notice of Filing Documents in

Support of Defendants' Motions for Summary Judgment and Attached Documents.

(Doc. No. 43, filed on March 31, 2006);

4.     Defendants Gilberto Santiago's and Kevin Beary's Notice of Filing Affidavits in

-1-

Support of Defendants' Motions for Summary Judgment and Attached Documents. (Doc. No. 44, filed on March 31, 2006);

5.     Defendants Gilberto Santiago's and Kevin Beary's Notice of Supplemental Authority and Attached Documents.  (Doc. No. 46, filed April 11, 2006);

6.     Plaintiffs Jessica Maiorano's and Jaclyn Costello's Memorandum of Law Against Defendant Gilberto Santiago's Motion for Summary Judgment and Attached Documents.  (Doc. No. 47, filed on April 20, 2006);

7.     Plaintiff Jessica Maiorano's and Jaclyn Costello's Memorandum of Law Against Defendant Gilberto Santiago's Motion for Summary Judgment and Attached Documents.  (Doc. No. 48, filed on April 20, 2006);

8.     Plaintiff Jessica Maiorano's and Jaclyn Costello's Memorandum of Law Against Defendant Kevin Beary's Motion for Summary Judgment and Attached Documents. (Doc. No. 49, filed on April 24, 2006);

9.     Plaintiff Jessica Maiorano's and Jaclyn Costello's Memorandum of Law Against Defendant Kevin Beary's Motion for Summary Judgment and Attached Documents. (Doc. No. 50, filed April 24, 2006);

10.    Defendants Kevin Beary's and Gilberto Santiago's Motion to Strike Plaintiffs' Documentation in Support of Opposition to Summary Judgment and Incorporated Memorandum of Law.  (Doc. No. 52, filed on May 3, 2006); and

11.    Plaintiff Jessica Maiorano's and Jaclyn Costello's Response and Memorandum of Law Against Defendants Kevin Beary's and Gilberto Santiago's Motion to Strike Plaintiffs' Documentation.  (Doc. No. 54, filed May 5, 2006).

**Background**

On April 14, 2004, Gilberto Santiago, a deputy sheriff with the Orange County Sheriff's Office, was a school resource officer at Freedom High School in Orange County, Florida.  (Doc. No. 44, Attachment 3, Affidavit of Gilberto Santiago, filed March 31, 2006, ¶¶ 2, 3).  At approximately 11:30 a.m. when Freedom High School students were changing classes between fourth and fifth period, Santiago observed several students running across the courtyard yelling "fight," "fight."  (*Id.* at ¶4).  Santiago looked in the direction that the students were running and observed two fights going on simultaneously in the courtyard area of the school.  (*Id.*)  Jessica Maiorano and Keri Cuda were fighting with each other, and Jaclyn Costello and Ashley Horner were fighting with each other.  (*Id.*)  Santiago observed the four students fighting violently, pulling each other's hair, and punching each other.  (*Id.*)  Santiago estimated that at least 100 or more students had already formed around the fight, and he pushed his way through the crowd of students which continued to grow.  (*Id.* at ¶ 5).  According to Santiago's account of the incident, droves of other students continued to run towards the fight.  (*Id.*)  After he arrived at the scene of the fight, Santiago claims that the four girls continued to fight, and he was unable to pull them apart.  (*Id.* at ¶ 6).  Santiago yelled at the girls to "break it up," but they did not stop fighting.  (*Id.*)  While the students were fighting, Santiago heard one male student encourage the fighting students to become more violent by yelling words like "kill her, kick her ass." (*Id.* at ¶ 14).  Santiago also heard one of the girls yelling fighting words to the effect, "I'm going to kill you, I'm going to kill you, I'm going to kick your ass."  (*Id.*)  Freedom High School Dean Youtz and Dean Lebron arrived on the scene at that time.  (*Id.* at ¶ 6).

At one point, Santiago claims that another student from the crowd got between him and the students who were fighting.  (*Id.* at ¶7).  Unsure as to whether the student intentionally got between

him and the fighting students or whether the student had been pushed by the crowd into the fighting area, Santiago found the situation to be volatile and dangerous.  (*Id.*)

At the time of the incident, Santiago had been previously contacted by the Orange County Sheriff's Office gang suppression unit and had been notified about the unit's suspicions regarding gang-related activity at Freedom High School.  (*Id.* at ¶ 8).  Santiago was convinced that if he did not get the situation under control very quickly, the school could erupt into even more violence.  (*Id.*) Having been a school resource officer for more than six years, Santiago was aware that it was not uncommon for students to bring weapons to school campuses.  (*Id.* at ¶ 9).  Normally, there are two school resource officers on duty at Freedom High School.  (*Id.* at ¶ 10).  However, the other officer was not at school on April 14, 2004, and Santiago was the only officer there.  (*Id.*)

Because of the volatility of the situation, Santiago felt that he needed to stop the fight as soon as possible and that it would be safest and most effective to use his agency-issued M26 taser which is an electronic device.  (*Id.* at ¶ 12).  Santiago had received four hours of training on the M26 taser prior to its issuance to him during which he had learned that the taser is a non-lethal device used to immediately subdue a subject with no real injury.  (*Id.*)  Santiago was concerned that the use of a chemical agent to stop the fight could cause cross-contamination to students, administrators, and himself and that the use of an expendable baton might cause serious injury to the girls involved in the fight and the students surrounding him.  (*Id.* at ¶ 13).  Because he wore a gun, Santiago considered that one of the students might become so excited that he or she could grab his gun and create an even more violent situation.  (*Id.*)

In order to control the situation, Santiago states that he administered one contact tase of the M26 taser to Maiorano as she was holding Cuda's hair.  (*Id.* at ¶ 14).  At that point, Cuda lunged

forwarded aggressively towards Maiorano, and Santiago administered one touch tase to Cuda.  (*Id.*)
Freedom High School Dean Youtz and Dean Lebron tried to control Maiorano and Cuda.  (*Id.*)

Because his efforts to stop the fight between Costello and Horner had been unsuccessful,
Santiago conducted a touch tase to both Costello and Horner.  (*Id.*)  Initially, Costello disengaged upon
being tased. (*Id.*)  However, Horner became more aggressive and attacked Costello again.[1]  (*Id.*)  In
response, Santiago administered a second touch tase to Horner who continued to be agitated and even
became aggressive towards Santiago as he tried to restrain her.  (*Id.*)  As a result, Santiago
administered a third touch tase to Horner who finally stopped resisting.  (*Id.*)  Santiago testified that it
was possible that Maiorano or Costello brushed against the taser or were pushed against the taser by
other students but that he never intentionally administered his taser to Maiorano or Costello more than
once.  (*Id.*)

Freedom High School Dean Maribel Lebron also testified to the facts of this case.  (Doc. No.
44, Attachment 4, Maribel Lebron Deposition, filed on March 31, 2006).  While standing near the 600
building stairwell, Lebron observed several students running across the courtyard yelling, "Fight,
Fight."  (*Id.* at ¶ 5).  As her attention was drawn to the direction in which the students were running,
she observed a large crowd of students forming and yelling "hit her" as if inciting students to fight.
(*Id.*)  When Lebron reached the crowd, she observed a male student running back and forth yelling,
"hit her, kick her ass."  (*Id.* at ¶ 9).  As Lebron approached the students, she yelled at them to break up
the fight, but more students continued to come to the area.  (*Id.* at ¶ 10).  Santiago yelled at the
students to break up the fight and tried to pull the students apart.  (*Id.*)  The other administrator, Dean

---

[1] Costello testified to the violent nature of the altercation.  (Doc. No. 43, Attachment 5,
pp. 19-20, p. 36).  Costello fought back with Horner and participated further in the physical
altercation.  (*Id.* at 36).

Youtz, was also in the midst of the students yelling at them to break up the fight.  (*Id.*)  Even though Lebron, Santiago, and Youtz were yelling at the students to stop fighting, according to Lebron the students did not respond and continued to fight.  (*Id.*)  Lebron, Santiago, and Youtz also yelled at the other students to go to class, but they did not respond to these instructions and stayed in place, shouting and yelling while the fights were in progress. (*Id.* at ¶ 11).  In Lebron's estimation at the time the fights were taking place, the situation was very volatile, and the entire school was basically disrupted.  (*Id.* at ¶ 12).  Lebron did not actually see Santiago use his taser because she was in the midst of the students trying to control the situation.  (*Id.* at ¶ 15).

Freedom High School Dean Charles Youtz also testified as to the events of April 14, 2004. (Doc. No. 44, Attachment 5, Affidavit of Charles Youtz).  Youtz learned of the fight when he heard shouting and yelling coming from the guidance area and noticed a crowd starting to form.  (*Id.* at ¶3).  As he approached the crowd, he observed four female students engaged in fights, swinging punches at each other, and pulling each other's hair.  (*Id.*)  The students who had gathered around the fights were shouting and yelling loudly, and some were even inciting and encouraging the fights.  (*Id.*)  Youtz yelled at the students to stop fighting, but they were very aggressive towards each other and continued their altercation.  (*Id.* at ¶ 4).  Youtz heard Santiago yell at the students to stop fighting and observed him trying to pull the students apart.  (*Id.* at ¶ 6).  According to Youtz, Santiago yelled at the female students at least two or three times to break up the fight.  (*Id.*)  Santiago then yelled at the students to stop fighting and tried to separate the students.  (*Id.* at ¶ 7).  Youtz observed Santiago using his taser on Maiorano and Cuda.  (*Id.*)  Even after Santiago used his taser, Youtz averred that the students continued to be aggressive towards each other once the effects of the tases wore off.  (*Id.*)  Youtz testified that Santiago tased Cuda more than once and that Youtz was eventually able to pull Maiorano

off to the side.  (*Id.*)  Because Youtz was dealing with Maiorano, he was not able to view the other

fight between Costello and Horner.  (*Id.* at ¶ 8).  Youtz estimated that there were between 700 and

1,000 students gathered around the two fights.  (*Id.* at ¶9).  During the 2003/2004 school year,

approximately 2,800 students were enrolled at Freedom High School, and they were all changing

classes when the bell rang between fourth and fifth period.  (*Id.* at ¶ 11).

Plaintiffs Maiorano and Costello offered accounts that differ in some respects with the accounts

of Defendant Santiago and Deans Youtz and Lebron.  Maiorano testified that she was walking to her

locker with Costello when Cuda and Horner approached them and started yelling.  (Doc. 43,

Attachment 4, Jessica Maiorano Deposition, p. 11, lines 5-8).  The fight started when Cuda touched

Maiorano in the face and hit Maiorano on the side of her head with a fist.  (*Id.* at p. 11-12, lines 9-10).

Maiorano responded by striking Cuda and grabbing her hair.  (*Id.* at p. 13, lines 22-23).  Maiorano

estimates that the fight lasted a little less than two minutes.  (*Id.* at p. 14, line 3).  During the fight,

other students yelled "throw her on the floor, beat her" and cheered the fight on.  (*Id.* at p. 14, line 19).

Maiorano testified that she never saw Santiago during the fight and heard the words "break the fight

up, break it up" from her friend Aubrey Lospinoso.  (*Id.* at p. 17, lines 12-14, p. 18, lines 2-11).  The

fight stopped after Maiorano felt "a burning in my back and just releasing, letting my hand just open

up.  And the next I knew, I was getting picked up off the floor by my dean."  (*Id.* at p. 19, lines 3-5).  It

was only after the fight was over and after Maiorano went to the dean's conference room that she

became aware that she had been tased.  (*Id.* at p. 20, lines 11-14).  Maiorano testified that she was

tased twice on the left side of her back, but only felt a burning sensation once  (*Id.* at p. 21, lines 21-25

p. 22, lines 1-12).  Maiorano did not seek medical attention for the burning sensation caused by the

taser strikes, but she did see a doctor for migraine headaches which came after the taser incident.  (*Id.*

at p. 22, lines 16-23, p. 24, lines 1-25 ).  Maiorano admits that she was suspended from school for ten

days and was found guilty of resisting arrest and disorderly conduct for her role in the fight.  (*Id.* at

p.35, lines 1-2).

Plaintiff Costello testified that the fight began when Cuda and Horner approached Costello and

Maiorano.  (Doc. No. 43, Attachment 5, Jaclyn Costello Deposition, p. 17, lines 12-26).  Horner

approached Costello and swung at her, and Costello grabbed Horner's hair in response.  (*Id.* at p. 17,

lines 24-25, p. 28, lines 1-6).  Costello admits repeatedly fighting with Horner:

> Yeah, I guess, so.  We were fighting. [Horner] was pulling my hair.  I was pulling her hair.  She
> was hitting me.  I was hitting her.  She was slapping me.  I slapped her.  She pushed me off of
> her.  I pushed her off of me.  It was just going back and forth.

(*Id.* at p. 19, line 25, p. 20, lines 1-4).

After Costello was tased the first time, Costello "kind of pulled [Horner's] hair out" and

"ripped" a chunk of Horner's hair because Horner "ripped" a chunk of Costello's hair.  (*Id.* at p. 27,

lines 8-12).  Costello and Horner momentarily stopped fighting, but Horner then came after Costello

again, pulled Costello by her hair, and kept hitting her.  (*Id.* at p. 27, lines 13-15).  Costello "didn't

stand there and let [Horner] attack" her without a response.  (*Id.* at p. 35, lines 23-24).  Costello

"ripped [Horner's] hair out" to get away from her.  (*Id.* at p. 29, lines 11-13, p. 35, lines 23-25, p. 36,

lines 1-6).  Costello was then tased a second time.  (*Id.* at p. 27, line 16).  After the second tase,

Horner attacked Costello again, and Costello attacked Horner in return.  (*Id.* at p. 27, lines 17-22).

Costello testified that Defendant Santiago then tased her in the back.  (*Id.* at p. 27, lines 21-22).

During the course of the altercation,  Costello stated that she was tased in the arm and twice on her

back while she was fighting, but admitted that she was not actually positive if she was tased on her

arm.  (*Id.* at p. 26, lines 16-22, p. 27, lines 2-4, 23-25).

Costello testified that during the fight, only Aubrey Lospinoso and Mariano Loria yelled to break up the fight. (*Id.* at p. 21, lines 8-12, p. 1-7). She stated that Santiago pushed his way through a crowd that had formed around the fight and tased the students while they were holding each others' hair in their fingers. (*Id.* at p. 23, lines 15-17). Costello did not hear Santiago say anything prior to his use of the taser, nor did she see Santiago pull out his taser gun. (*Id.* at p. 23, lines 24-25, p. 25, lines 1-2). Costello did not experience any on-going medical problems as a result of being tased. (*Id.* at p. 49, lines 15-17). Costello was suspended from school for ten days and was also found guilty of disrupting an educational institution and resisting arrest without violence. (*Id.* at 47, lines 12-13, 18) (Doc. No. 43, Attachment 8, Adjudicatory Hearing, pp. 176-80).

Plaintiffs filed affidavits of six Freedom High School students regarding the tasing incident on April 14, 2004. The affidavits conflict with each other, and some conflict with the testimony of Plaintiffs. Alvin Velazquez and Jennifer Mach testified that Defendant Santiago ran up to Plaintiffs while they were fighting and tased them without trying to pull them apart first. (Doc. No. 48, Attachment 23, Alvin Velazquez affidavit, ¶ 7) (*See* Doc. No. 48, Attachment 19, Jennifer Mach affidavit, ¶6). Kevin Ligad and Mariano Loria testified that Plaintiff Maiorano and Cuda were not fighting when they were tased. (Doc. No. 48, Attachment 13, Kevin Ligad Affidavit, ¶ 5) (Doc. No. 48, Attachment 15, Mariano Loria Affidavit, ¶ 7). Brianna Mitchell testified that Plaintiff Maiorano was tased after the fight was over. (Doc. No. 48, Attachment 21, Brianna Mitchell Affidavit, ¶5). Aubrey Lospinoso testified that the four students had stopped fighting when Defendant Santiago arrived at the scene and that Defendant Santiago tased the students after the fighting had concluded. (Doc. No. 48, Attachment 16, Aubrey Lospinoso Affidavit, ¶ 3) (Doc. No. 48, Attachment 17, Aubrey Lospinoso Affidavit, ¶¶7-9).

The Orange County Sheriff's Office provides use of force training for its deputies and implements policies and procedures for ensuring that its deputies are properly trained in Florida law and United States Constitutional law and law enforcement duties in general.  (Doc. No. 44, Attachment 1, Affidavit of David Ogden, ¶ 4).  Prior to being appointed to a deputy position, the Orange County Sheriff's Office requires all deputies to attend or show proof of attendance at a law enforcement academy covering basic law enforcement training curriculum approved by the Florida Department of law Enforcement Commission on Police Officer Standards and Training.  (*Id.* at ¶ 5).  After a deputy has completed his or her first year of service, the Orange County Sheriff's Office has an annual mandatory forty hour continuing in-serving training requirement for all deputies.  (*Id.* at ¶ 7).  Each deputy is required to undergo use of force training annually which includes classroom training on the use of force matrix, hands-on defensive tactics training and firearm training.  (*Id.* at ¶ 8).  Deputies who carry a taser are required to undergo a four hour basic training course on the use of the taser prior to being issued a taser.  (*Id.* at ¶ 9).  In addition, the in-service use of force training curriculum incorporates taser application, defense tactics, and verbal communication skills.  (*Id.*)  On and before April 14, 2004, Orange County deputies were taught in use of force training that they should exhaust verbal communication options with suspects prior to deploying their taser, if possible and feasible.  (*Id.* at ¶ 10).  Between January 1, 2000 and January 1, 2005, 144 complaints were made against deputies of the Orange County Sheriff's Office for excessive use of force.  (Doc. No. 50, Attachment 1, Deposition of Ronald Stucker, p. 39).  Of the 144 excessive force complaints, fourteen involved the use of a taser.  (*Id.* at 40-41).  During that same time period, six police officers were disciplined for excessive use of force.  (*Id.* at 42).

The Orange County Sheriff's Office Use of Force Policy was designed to establish guidelines

for the appropriate use of force and ensure proper training for all personnel in defensive weapons. (Doc. No. 43, Attachment 6, Orange County Sheriff's Office Use of Force Policy, p. 1).  Deputies are instructed not to strike or use physical force against any person "except when necessary in self defense, in defense of another, to overcome physical resistance to lawful commands, or to prevent the escape of an arrested person."  (*Id.*)  The Use of Force Matrix was intended to be used as a guideline for a deputy to select effective, reasonable, and legal force options in a verbal or physical encounter. (*Id.* at 3-4).  At subject resistance level 3 known as "passive physical resistance–slight physical harm," the subject physically refuses to respond to a deputy's command.  (*Id.* at 3).  While the subject does not make any attempt to physically defeat the actions of the deputy, the subject forces the deputy to employ physical maneuvers such as a taser or chemical agent to establish control.  (*Id.*)

Defendant Santiago testified that he received extensive training regarding the proper use of force in different scenarios.  (Doc. No. 44, Attachment 3, ¶ 16).  As an Orange County deputy sheriff, Santiago had undergone a field service training program, annual in-service training which always included use of force training, refresher courses in various areas of law enforcement, and a four hour training course on the proper use of the taser.  (*Id.*)  Santiago testified that he was familiar with the Orange County Sheriff's Office use of force matrix and believed that his use of the taser was appropriate under the Orange County Sheriff's Office Use of Force Policy.  (*Id.*)

On February 24, 2005, Plaintiff Jessica Maiorano filed an Amended Complaint with three counts.  (Doc. No. 9).  Count I is a claim against Defendant Gilberto Santiago under 42 U.S.C. section 1983 alleging that he violated Maiorano's Fourth Amendment rights.  Count II alleges a cause of action against Orange County Sheriff Kevin Beary claiming that Maiorano suffered continuous pain and psychological damage as a result of the policy decisions implemented by Beary.  Count III alleges

a cause of action against John Does 1-5.  Plaintiff Jaclyn Costello asserted the same claims in her complaint as were asserted by Plaintiff Jessica Maiorano.  On July 7, 2005, the Court consolidated Plaintiff Jessica Maiorano's case with Plaintiff Jaclyn Costello's case.  (Doc. No. 24).

On March 31, 2006, Defendants Gilberto Santiago and Kevin Beary filed Motions for Summary Judgment.  (Doc. Nos. 41, 42).  Santiago argues that he is entitled to qualified immunity because he did not violate Plaintiffs' constitutional rights and because it was not clearly established that the amount of force used by Santiago was plainly unlawful.  Beary argues that summary judgment should be granted in his favor because Santiago did not use excessive force when using his taser on Plaintiffs and because there is no custom or policy that sanctions the excessive use of force.

On April 20, 2006, Plaintiffs filed responses to Defendants' Motions for Summary Judgment. (Doc. Nos. 47, 48, 49, 50).  Enclosed as part of Plaintiffs' responses in support of its opposition to Defendants' Motions for Summary Judgment are eleven unauthenticated statements of unknown witnesses which detail the alleged events surround the taser incident on April 14, 2004.  (Doc. No. 47, Attachments 1-10); (Doc. No. 48, Attachments 1-11); (Doc. No. 49, Attachments 1-10).  Many of the exhibits and memoranda filed by Plaintiffs in opposition to Defendants' Motions for Summary Judgment at Docket entries 47, 48, 49, and 50 are virtually identical.  Such duplicative and repetitive filings are improper.

On May 3, 2006, Defendants filed a Motion to Strike Plaintiffs' Documentation in Support of their Opposition to Defendants' Motions for Summary Judgment.  (Doc. No. 52).  On May 5, 2006, Plaintiffs filed a response to Defendants' Motion to Strike.  (Doc. No. 54).

This Order analyzes Defendants' Motion to Strike and Motions for Summary Judgment.

## **Motion to Strike**

Defendants argue that the Court should exclude the affidavits of Kevin Ligad, Mariano Loria, Aubrey Lospinoso, Jennifer Mach, Brianna Mitchell, and Alvin Velasquez because the affidavits are not based on personal knowledge and contain conclusory allegations and hearsay.  Defendants also ask the Court to exclude the alleged Taser International document, eleven unauthenticated witness statements, and the deposition of Ronald Stucker.

Defendants' personal knowledge argument boils down to an assertion that the affidavits do not contain enough specific factual information to be credible.  For example, Defendants take issue with Mach's averment that Santiago tased the four girls because Mach failed to specify the circumstances under which the tasing occurred, who was tased, and how many times.  The affiants assert that they witnessed the fights that occurred on April 14, 2004, and at the summary judgment stage it is not within the Court's purview to determine credibility issues.  *Mack v. Anderson Elec. Co.*, 580 F.2d 191, 192 (5th Cir. 1978) (internal citation omitted).  Because credibility is an issue to be determined at trial, the Court finds that Defendants' argument that the affidavits are not based on personal knowledge is without merit.

Defendants also take issue with hearsay statements contained within the affidavits and conclusory, speculative statements made by the affiants.  For instance, Defendants cite Ligad's averment that he "heard Jackie had welts on her back for a long time and Ashley had to go to the hospital for heart problems."  (Doc. No. 48, Attachment 13, ¶ 6).  Defendants also highlight Velasquez's testimony that he thought that Santiago could have pulled the students apart before tasing them.  (Doc. No. 48, Attachment 23, ¶ 7).

The Federal Rules of Evidence apply to this case, and the Court will consider the affidavits, documents, and deposition testimony in light of Defendants' concerns regarding hearsay and

conclusory, speculative testimony.  While some of the affidavits contain speculative statements and hearsay, this is not a sufficient basis to exclude the affidavits in their entirety.  The Court will consider the admissible portions of the affidavits in analyzing Defendants' Motions for Summary Judgment.

Defendants argue that the eleven unsigned, unauthenticated statements should not be considered by the Court.  Proper authentication of the statements is a necessity at the summary judgment stage, and the Court will not consider the eleven unauthenticated statements for this reason.  *See* Fed. R. Civ. P. 56(c) and (e); Fed. R. Evid. 901(a).

Defendants contend that the Court should exclude the alleged Taser International document.  Plaintiffs acknowledge that the alleged Taser International document has not been properly authenticated.  Plaintiffs offer the document to rebut Defendants' claim that Santiago was properly trained by Beary on the proper use of the taser device and that the device was a safe weapon.  Plaintiffs state that they attempted to secure an affidavit from a representative of Taser International, Inc. concerning the product warnings in existence on April 14, 2004.  Plaintiffs also claim that they were "stonewalled" by the corporate publicity machine and that the Court should grant a continuance to secure a properly authenticated affidavit.

The Court has evaluated the alleged Taser International document.  The document will not be considered by the Court because it has not been properly authenticated.  Plaintiffs' request for a continuance to obtain an affidavit to authenticate the document comes at a late stage of the litigation.  Such request should have been made well in advance of the summary judgment deadline rather than in a response to Defendants' Motion to Strike.  More importantly, even if the document was properly authenticated, it does not create a genuine issue of material fact as to whether Santiago was trained properly and whether the taser device was a safe weapon because the document states that the taser is a

weapon "designed to incapacitate a person from a safe distance while reducing the likelihood of serious injuries or death" and that the taser is a "safe and more effective alternative" compared to other traditional use of force techniques  (Doc. No. 47, Attachment 40).

Defendants' final argument is that the Court should exclude the deposition of Charles Stucker because it contains inadmissible hearsay.  Defendants, however, fail to pinpoint which parts of the fifty-seven page deposition constitute hearsay and simply make a blanket argument that the entire deposition constitutes hearsay.  Thus, Defendants leave the burden on the Court to cull through every line of the deposition to determine which parts of the deposition constitute hearsay and which parts do not.  The Court is cognizant of the fact that the Federal Rules of Evidence apply and will evaluate the Stucker deposition in light of those Rules.

## Motion for Summary Judgment

### Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the nonmoving party." *Id.*  The moving party bears the burden of proving that no genuine issue of material fact exists.  *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the Court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party.  *Anderson*, 477 U.S. at 255.  The Court

may not weigh conflicting evidence or weigh the credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993) (citation omitted).  If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the Court must not grant summary judgment. Id. (citation omitted)

## Analysis

### *1. Defendant Santiago's Argument that Qualified Immunity Bars Plaintiffs' Excessive Force Claim*

Defendant Santiago argues that the doctrine of qualified immunity bars Plaintiffs' excessive force claim.  Qualified immunity offers public police enforcement officers complete protection against suits if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity allows government officials to carry out their duties without fear of liability or litigation, "protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).

To receive qualified immunity, the public official must first demonstrate that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).  In the instant case, there is no dispute that Defendant Santiago was acting within the course and scope of his discretionary authority when he tased Plaintiffs.

Once the defendant establishes that he was acting within the scope of his discretionary authority, the burden shifts to the plaintiff to demonstrate that qualified immunity is not appropriate. *Id.*  The first step of this inquiry requires the Court to determine whether the facts "[t]aken in the light most favorable to the party asserting the injury, ...show the officer's conduct violated a constitutional

right[.]"  *Saucier v. Katz*, 533 U.S. 194, 201 (2002).

Santiago claims that there is no genuine issue of material fact as to whether he violated Plaintiffs' Fourth Amendment right to be free from the use of excessive force.  All claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  Whether the force is reasonable hinges on the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  The "reasonableness" of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.*  The "calculus of reasonableness" must embody allowance for the fact that police officers are often forced to make split-second judgments in tense, uncertain, and rapidly changing situations. *Id.* at 396-97.

The Eleventh Circuit has interpreted the Supreme Court's language in *Graham* as requiring the balancing of three factors in determining whether the force applied was reasonable.  *Draper v. Reynolds*, 369 F.3d 1270, 1277-78 (11th Cir. 2004).  These factors are the need for the application of force, the relationship between the need and the amount of force used, and the extent of injury inflicted. *Id.*

Both Plaintiffs and Defendant Santiago have clearly testified that the fights between Maiorano and Cuda and Costello and Horner were ongoing when Plaintiffs were tased by Santiago.  (Doc. No. 43, Attachment 4, p. 19, lines 1-5) (Doc. No. 43, Attachment 5, pp. 32-37) (Doc. No. 44, Attachment 3, ¶ 14).  The Court notes that some of the affidavits submitted by Plaintiffs after their depositions

conflict with each other and with the testimony of Plaintiffs on this point.[2]  However, while Plaintiffs may not submit affidavits of themselves which contradict their own sworn testimony in an effort to create an issue of fact,[3] neither should they be allowed to manufacture an issue of fact by submitting affidavits of others that contradict their own clear and unambiguous sworn testimony and the testimony of Defendant on a material issue as to which they are fully competent to testify: that is whether the fight was ongoing when they were tased.  Thus, while some Freedom Highschool students testified that Plaintiffs were not fighting at the time that they were tased, the Court will analyze the factual scenario based on Plaintiffs' own account of the case in which they clearly testified that they were in fact fighting at the times that they were tased.[4]

Applying the *Graham* and *Draper* factors to Plaintiffs' version of the incident, the use of the taser was necessary because Plaintiffs were a threat to each other and to others and created a chaotic, unruly situation at the school.  Defendant Santiago was faced with two violent physical altercations involving four students occurring simultaneously with 50 or more students surrounding the altercations chanting and screaming fighting words in an effort to escalate the fight and with many more students

---

[2] For instance, as noted earlier Alvin Velazquez and Jennifer Mach testified that Plaintiffs were fighting when Defendant Santiago tased them.  Kevin Ligad and Mariano Loria testified that Plaintiff Maiorano and Cuda were not fighting when they were tased.  Brianna Mitchell testified that Plaintiff Maiorano was tased after the conclusion of the fight.  Aubrey Lospinoso testified that the four students had stopped fighting when Defendant Santiago arrived at the scene and that Defendant Santiago tased the students after the fighting had concluded.

[3] *See, e.g., Van T. Junkins & Assoc. v. U.S. Indus*, 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").

[4] The Court notes that there is evidence that Plaintiff Costello stopped fighting momentarily after being tased but then continued the fight with her opponent.

running to the location while 700 students left lunch and others were changing classes.  All of this was observed within the context of his knowledge of potential gang activity.  While Plaintiffs and Defendant Santiago disagree as to whether Defendant Santiago warned Plaintiffs before he used his taser, given the fact that the physical altercation created a dangerous, volatile situation, it was both reasonable and necessary to use the taser on Plaintiffs, even without a previous warning.

Defendant Santiago's use of the taser gun to subdue Plaintiffs was reasonably proportionate to the "difficult, tense and uncertain situation" that he faced in light of the altercation and did not constitute excessive force.  *See Draper*, 369 F.3d at 1278.  Plaintiffs were hostile, belligerent, and uncooperative, and there was a reasonable need for the use of some force in order to control the situation.  *See id.*  Although being struck by a taser is an unpleasant experience, the use of such force was reasonably proportionate to the need for force and did not inflict serious injury on either Plaintiff.  *See id.*  (Doc. No. 43, Attachment 4, p. 22, lines 16-24) (Doc. No. 43, Attachment 5, p. 49, lines 15-17).

There is a factual dispute as to how many times Plaintiffs were tased.  Defendant Santiago testified that he only intentionally administered one taser touch to each Plaintiff.  Plaintiff Maiorano testified that she was tased twice on the left side of her back, but only felt a burning sensation once.  Plaintiff Costello testified that she was tased once on her arm and twice on her back, but acknowledged that she was not positive if she was actually tased on her arm.  Assuming that Defendant Santiago tased each Plaintiff multiple times, both Plaintiffs and Defendant Santiago agree that the fighting was ongoing each time they were tased.

Plaintiff Maiorano testified as to her fight with Keri Cuda:

Q.  Now, at some point, the fight stopped.  Tell me what you remember about how the fight stopped.

A.  Feeling a burning in my back and just releasing, letting my hand just open up.  And the next I knew, I was getting picked up off the floor by my dean.

(Doc. 43, Attachment 4, p. 19, lines 1-5)

Q.  Let me go back to how the fight ended.  You said that you felt a burn in your back?
A.  Mm-hmm.
Q.  Yes?
A.. Yes.
Q.  Was there anything else that you felt that caused the fight to end?
A.  Not that I remember.

(*Id.* at p.19, lines 23-25, p. 20, lines 1-5.)

Q.  Did you feel both times when you were Tased?
A.  No.
Q.  You only felt once.  You only felt a burning sensation once?
A.  Once and then I just remember waking up.

(*Id.* at p. 22, lines 8-12.).

Plaintiff Costello testified as to her fight with Ashley Horner:

Q.  Were you not – she wasn't swinging at you?
A.  Not really.  She had my hair in both her hands.  She let go a couple of times to hit me and I probably did the same thing, but I didn't really know what to do.
Q.  Did you ever hit her on any part of her body other than holding her hair?
A.  I don't know, I was fighting her.  We were fighting, so I don't know.
Like, I wasn't concentrating – I wasn't planning it out on my head.  It wasn't something that I planned to do.
Q.  So I'm trying to be sure I understand whether you were just standing there holding her hair, or were you trying to hit her and strike her in some fashion?
A.  Yeah, I guess, so.  We were fighting.  She was pulling my hair.  I was pulling her hair.  She was hitting me.  I was hitting her.  She was slapping me.  I slapped her.  She pushed me off of her.  I pushed her off of me.  It was just going back and forth.

(Doc. 43, Attachment 5, p.19, lines 11-25, p. 20, lines 1-4.)

Q.  And at some point did Deputy Santiago approach the place where you and the other girl were fighting?
A.  Yes.
Q.  Did you see him arrive?
A.  I didn't see him actually get there.  I saw him first put down his coffee on a window sill and then run up to the fight and like kind of break through the crowd.  And then the girl kind of

spun me around so I didn't see him anymore.  And then I saw him taser her.
But I saw him taser the girl Kerri first, and that girl Jessica too first, and then I saw him taser
Ashley.  I was like – we were pulling away from each other but our hair was all in our fingers
and stuff.

Q. Did you hear Deputy Santiago say anything.

A. No.

Q. Now, you're saying he broke through the crowd, does that mean a crowd had gotten –

A. Yeah, like he walked up to us – there was a couple people around us, like I said those
people breaking up the fight, stuff like that.  So he had to get through them – like move them
away from us.........

Q. And is it your testimony that he tasered the other two girls who were fighting first?

A. Yes.

Q. Okay.  And how far away would you say you were from the other two girls who were
fighting?

A. We were right next to them.

Q. Okay.  Could you reach out and touch them; were they that close to you?

A. Yes.

(*Id.* at p. 23, lines 11-25, p. 24, lines 1-6, p. 25, lines 3-11.)

Q. What did you do when you were tasered?

A. Like what?  I got tased on my arm.  I'm pretty sure it was because our hair – we were
holding each others hair, so I kind of pulled her hair out because like I said our fingers were
wrapped in each others hair so we couldn't get out of each other for awhile.  And I felt her rip a
chunk of my hair out, and I ripped hers out just to get away from her.  And then we stopped.
And then she came after me again and she pulled me by my hair and turned me back around
and then she kept hitting me.  And she got tasered, and then I got tasered again.
And then like pretty much the exact same thing happened again.  She started hitting me again
and I turned around – like she had me by my hair bent over like that (indicating), and she was
hitting me, and then he tasered her, and he tasered me.  That's how I got tasered in the back
too.

(*Id.* at p.27, lines 6-22.)

Q. Okay.  So Deputy Santiago tased Ashley once and she started falling?

A. Yeah.

Q. Okay.

A. Like she got tasered hard – or it seemed like it anyway.  She was crying hysterically.

Q. Did she do anything else besides fall?

A. She was just crying.

Q. Did she let go of your hair?

A. She pulled it out to let go of my hair.

Q. Okay.  Once – and then Deputy Santiago tased you, is that correct?

A. No, he tased the other girl on the other side and then he went back to me and tasered me

again because she attacked me after we had pulled apart.

Q. Okay.  When she attacked you again, she, meaning Ashley?

A. Yes.

Q. Did you then go back and begin pulling her hair again?

A. Yeah, it was something like that.

Q. So, I mean, you just didn't stand there and let her attack you, is that correct?

A. No, After she – like she had just grabbed my hair, because my back was to her, so when she pulled my hair like I turned around.  So I was like this again (indicating), and she was hitting me, but I was just pulling her hair, like pushing her away, pulling my hair.  I was trying to get her to stop pulling my hair like that because I was bent over.

(*Id*. at p. 35, lines 2-25, p. 36, lines 1-6).

Q. Because what I'm trying to understand is whether when she attacked you the second time, did you fight back?

A. Yeah.

Q. Okay.  And in order to fight back would you have to have been facing her?

A. We weren't really just standing in one spot we were all over the place.  We moved like a whole – the guidance office is like this (indicating), and we started here (indicating), and we were down here (indicating) by the time I got completely pulled off of her.  Every time I would walk away I got pulled back again.

Q. By who?

A. Her.

Q. Okay.

A. It was like we were all right here (indicating).

The four of us were right here (indicating) and there's sort of like a hallway kind of thing but it's not in a hallway, it's just an overhang.

Q. Okay.  And then would you go back to fighting her?

A. Yeah.  Every time we would start fighting again, we'd get tasered again.  But she got tasered after me.  Like once again after me because she kept trying to come after me.....

(*Id*. at p.36, lines 17-25, p. 37, 1-15).

Q. So how many times would you say that Ashley attacked you?

A. In the beginning she had me first, then I walked away.  Like I just kind of backed away from  it and then we fought again, and then I got tasered, and then I pulled away, and that's when I fell on the floor.  I don't know if she did.  I was on the floor though.  And I had like just rolled over on my knees and got up like that (indicating).  And then she pulled my hair again, and we fought again and that's when I got tasered in the middle and couldn't breathe at all.  I so I just completely fell on the floor and started crying.

Q. So each time Ashley attacked you in some fashion you attacked her right back, is that right?

Q. Okay.  So you basically were drawn back into the fight each time?

A. Yeah.

(*Id*. at p.38, lines 1-18).

> Q. Now, was the same thing happening with Kerri and Jessica him, him meaning Deputy Santiago, trying to pull them apart?
> A. I don't know. He didn't – like he never tried to pull us apart. He tasered me and Ashley to get us apart. That was why we pulled apart.
> Q. But then she attacked again, is that correct?
> A. Right.
> Q. And then you defended yourself again by attacking her, is that correct?
> A. Yes.

(*Id*. at p. l 40, lines 10-19).

In light of the volatile situation that Defendant Santiago faced, the fact that both Plaintiffs were fighting when being tased, and the fact that Plaintiffs did not suffer any injuries as a result of the tasings, such force was *de minimis* in nature. *See, e.g., Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (explaining that some use of force by a police officer when making an arrest is necessary and lawful, regardless of the severity of the alleged offense); *see also Gold v. City of Miami*, 121 F.3d 1442, 1446 (11th Cir. 1997) (the minor nature of an injury reflects that only minimal force was used). Thus, there is no genuine issue of material fact as to whether Defendant Santiago violated the Constitution, and Defendant Santiago is entitled to qualified immunity.

### 2. Defendant Beary's Argument that Summary Judgment is Appropriate in his Favor Because Defendant Santiago did not violate the Constitution and there is no Custom Sanctioning the Use of Excessive Force

The Court now shifts its attention to Defendant Beary's argument that summary judgment should be granted in his favor because Defendant Santiago did not violate the Constitution and there is no custom or policy sanctioning the use of excessive force.

Defendant Beary argues that the Court's finding that Defendant Santiago did not violate the Constitution necessarily precludes his liability. This argument is supported by *City of Los Angeles v.*

*Heller*, 475 U.S. 796 (1986).  In *Heller*, the Supreme Court stated that no case authorizes the award of damages against a municipality based on the actions of one of its officers when the jury concludes that the officer did not inflict a constitutional harm.  *Id.* at 799.  The Court found that if a person has not suffered a constitutional injury at the hands of an individual police officer, then the fact that departmental guidelines may have authorized the use of constitutionally excessive force is beside the point.  *Id.*  In the instant case, the Court finds that the reasoning from *Heller* applies because the Court has already found that Defendant Santiago's actions did not violate the Constitution.  Because Plaintiffs have failed to prove that Defendant Santiago violated the Constitution, the Court finds that Defendant Beary is not liable under section 1983.

Even if the Court had found that Defendant Santiago violated a clearly established rule of law and was ultimately not entitled to qualified immunity, Plaintiffs' claim against Defendant Beary would still fail.

A municipality cannot be held liable for the actions of its employees under section 1983 based on a theory of respondeat superior.  *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 663 (1978).  A municipality is liable only if the deprivation is pursuant to a government custom or policy.  *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1307 (11th Cir. 2001).

Plaintiffs argue that Defendant Beary promulgated a policy that sanctioned the use of force because: 1) the Use of Force Policy lacks direction because it does not mention taking the age of a suspect into consideration before using the taser; and 2) the constitutional factors in *Graham v. Connor*, 490 U.S. 386, 396 (1989) and *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002), are not explicated in the Use of Force Policy.

Contrary to Plaintiffs' argument, the Orange County Sheriff's Office Use of Force Policy

provides that size, age, and weight of the subject are factors that a deputy should consider when making a use of force decision.  (Doc. No. 43, Attachment 6, p. 5).  Furthermore, while *Graham* and *Ferraro* explain the factors that courts should analyze in evaluating whether an officer used a reasonable amount of force under the Fourth Amendment, those cases do not hold, nor has the Court's independent research produced a case holding, that a use of force policy must contain an explanation of the *Graham* and *Ferraro* factors in order to demonstrate that a policy does not sanction the use of excessive force.

The Orange County Sheriff's Office Use of Force Policy demonstrates that Defendant Beary crafted a policy that allows for the use of a taser only in certain instances.  Deputies are further instructed not to use any force except in very limited circumstances such as self defense or overcoming physical resistance.  Contrary to Plaintiffs' argument, the Use of Force Policy does not sanction the use of excessive force.  The record further reflects that deputies are continuously trained in making proper and lawful arrests and the appropriate use of force through annual block training and evaluations. While the record reflects that there were 14 excessive force complaints involving tasers and six officers who were disciplined for the use of excessive force in a five year time period,[5] this is more demonstrative of random, single, and isolated acts and is insufficient to establish a custom or policy. *Depew v. City of St. Mary's*, 787 F.2d 1496, 1499 (11th Cir. 1986) ("To establish a policy of custom, it is generally necessary to show a persistent, widespread practice...normally random acts or isolated incidents are insufficient to establish a custom or policy."); *Brooks v. Scheib*, 813, F.3d 1191, 1193 (11th Cir. 1997) (explaining that "the number of complaints bears no relation to their validity.").

Because the Use of Force Policy does not sanction the use of excessive force and because

---

[5] It is not clear from the record whether the six officers who were disciplined used a taser.

Plaintiffs have failed to meet their burden of production on this issue, summary judgment in favor of Defendant Beary is appropriate on this additional ground as well.

### Conclusion

Based on the foregoing, the Court **GRANTS** Defendant Gilberto Santiago's Motion for Summary Judgment (Doc. No. 41) and **GRANTS** Defendant Kevin Beary's Motion for Summary Judgment.  (Doc. No. 42).  Judgment shall be entered in favor of Defendants and against Plaintiffs.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on July __15____ 2006.

_____

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:
Counsel of Record